# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-SA-00174-SCT

*IN THE MATTER OF THE STEWARDSHIP OF THE PUBLIC TRUST TIDELANDS: CITY OF BILOXI, MISSISSIPPI*

*v.*

*THE SECRETARY OF STATE OF THE STATE OF MISSISSIPPI, IN HIS OFFICIAL CAPACITY BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING IN ITS OWN CAPACITY AND ON BEHALF OF THE UNIVERSITY OF SOUTHERN MISSISSIPPI, THE GULF COAST RESEARCH LABORATORY AND THE J.L. SCOTT MARINE EDUCATION CENTER AND RIVERBOAT CORPORATION OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2019 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| TRIAL COURT ATTORNEYS: | PETER C. ABIDE |
| | NANCY MORSE PARKES |
| | GERALD HENRY BLESSEY |
| | DONALD C. DORNAN, JR. |
| | BRITT R. SINGLETARY |
| | BEN HARRY STONE |
| | JONATHAN PAUL DYAL |
| | KARL CRAWFORD HIGHTOWER |
| | WILSON DOUGLAS MINOR |
| | TAYLOR BRANTLEY McNEEL |
| | KATHERINE HEWES HOOD |
| | MICHAEL E. WHITEHEAD |
| | ROBERT D. GHOLSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL E. WHITEHEAD |
| | PETER C. ABIDE |
| | GERALD HENRY BLESSEY |

ATTORNEYS FOR APPELLEES:       JONATHAN PAUL DYAL
                               BEN H. STONE
                               DONALD C. DORNAN, JR.
                               WILLIAM DEMENT DRINKWATER
                               STEPHANIE GEE BEAVER
                               KARL CRAWFORD HIGHTOWER
                               KATHERINE HEWES HOOD

NATURE OF THE CASE:            CIVIL - CONTRACT
DISPOSITION:                   AFFIRMED - 03/11/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     The City of Biloxi (City), the Secretary of State on behalf of the State of Mississippi

(State), and the Board of Trustees of the State Institutes of Higher Learning (IHL) settled an

ownership dispute over coastal property leased to a casino and agreed how to divide the

annual casino rent.  Seventeen years later, the City asked the chancery court to declare that

it could adjust for inflation its base amount of rent received before divvying up its rent with

the State and the IHL.  But the City's only support of its new inflation-adjustment claim is

the three public entities' lease with the casino.  While the casino lease *does* require the

minimum amount of rent owed be adjusted for inflation every five years, the casino lease

*does not* govern how the City, the State, and the IHL are to divide this rent.  Instead, the

manner in which rent is divided is governed solely by the settlement agreement.  And the

settlement agreement does not provide for inflation adjustment.  Rather, the agreement is

2

clear—the City receives a specific sum, and any rent in excess of that exact amount must be shared with the State and the IHL.

¶2. Thus, the chancellor correctly denied the City's motion for declaratory judgment. We affirm.

## Background Facts and Procedural History

¶3. This case involves two agreements executed on the same day in 2002 by the same parties.

¶4. The first is the Point Cadet Compromise and Settlement Agreement (PCCSA). The four parties were the City, the State, the IHL, and the Isle of Capri Casino. The PCCSA resolved a long-standing ownership dispute over coastal property referred to as the Point Cadet Property. The City, the State, and the IHL each asserted an ownership interest in the Point Cadet Property, while the Isle of Capri Casino held a leasehold interest.

¶5. As part of the PCCSA, the City, the State, and the IHL agreed to the following division of any rent payments on existing City leases:

    (a) CITY will receive all rents up to an amount equal to two million seven hundred thirty-three thousand and no/100 dollars ($2,733,000.00).

    (b) All rents in excess of two million seven hundred thirty-three thousand and no/100 dollars ($2,733,000.00) will be divided as follows -

        One-third (1/3) to STATE
        One-third (1/3) to IHL
        One-third (1/3) to CITY.

In other words, under the PCCSA, the City gets to keep the first $2,733,000 in rent collected. Then, any additional rent must be divided equally among the City, the State, and the IHL.

3

¶6.     The second agreement is a lease referred to as the Podium Lease.  It was entered into at the same time by the same four parties—the City, the State, the IHL, and the Isle of Capri Casino.  It is undisputed that the Podium Lease is an "existing City lease" under the PCCSA.

¶7.     The Podium Lease ties the amount of annual rent the casino must pay to the casino's revenue.  But there is a $2,733,000 "floor" or minimum rent requirement.  Under the Podium Lease, this floor will increase for inflation every five years according to the Consumer Price Index (CPI).  In other words, the minimum rent the casino had to pay starting in 2002 was $2,733,000, and this floor was to be adjusted upward for inflation every five years.

¶8.     For fourteen years, the City received $2,733,000 in rent and then shared all rent in excess of $2,733,000—including the adjusted floor amount the casino had to pay.  In 2016, the City had to file an enforcement action against the State for taking more than its appropriate share.  In that action, the rent amount the City sought was based on its calculation that it was entitled to the first $2,733,000 collected.  The City made no assertion that it was actually owed more based on inflation.

¶9.     But in 2019, the City returned to chancery court with a novel pitch.  The City asked the chancellor to declare that the CPI increase in the Podium Lease also applied to the rent division in the PCCSA.  The City insisted the two agreements, which were executed at the same time by the same parties, had to be read together.  And under the City's conjunctive reading of the two documents, the CPI increase in the Podium Lease applied not only to the $2,733,000 rent floor the casino must pay but also to the $2,733,000 the City receives under the PCCSA before sharing this additional rent with the State and the IHL.

4

¶10. The chancellor denied the City's motion. She found neither the PCCSA nor the Podium Lease were ambiguous. Under the Podium Lease, the amount of rent to be paid, including the $2,733,000 floor, is to be adjusted for inflation using the CPI. But the method in which the City, the State, and the IHL were to divide the rent payments, which include the CPI adjustments, was governed *solely* by the PCCSA. And the chancellor found the PCCSA's rent division was not affected by the Podium Lease's CPI adjustments. Thus, "[t]he benefit of the aggregate CPI adjustment [required under the Podium Lease] is shared equally among the co-lessors [under the Settlement Agrement]."

¶11. Specifically, the chancellor rejected the City's contention that the PCCSA's provision that the City was entitled to "all rents up to an amount equal to" $2,733,000 means the City's undivided share of $2,733,000 must be adjusted for inflation in tandem with the inflation adjustment required under the Podium Lease. Such an interpretation, in her view, "attempts to take language governing the vertical relationship between the lessee and lessors [in the Podium Lease] and apply it to the horizontal relationship between co-lessors [in the PCCSA]."

¶12. Additionally and alternatively, the chancellor found the City was judicially estopped from taking a different and inconsistent position than it took three years earlier.[1]

---

[1] In 2016, the City moved to enforce the PCCSA, asserting it was owed a specific amount of rent that the State had unlawfully swept from the trust account into which the Podium Lease's rent is paid. In making its argument then, the City used $2,733,000 as the base amount of rent it was owed before dividing the excess with the State and the IHL with no mention of a CPI adjustment for inflation. As the chancellor succinctly said, "[t]he City urged this position. The [c]ourt accepted it and entered an agreed order effecting same. The City is now precluded from requesting a different amount." Ten days after the chancellor entered her order denying the motion for declaratory judgment, the City filed a "motion to

5

¶13.    The City has appealed, raising two issues.  First, the City asserts the chancellor erred by not interpreting the PCCSA's base rent to include the Podium Lease CPI adjustment. Second, the City argues the chancellor erred by alternatively applying the doctrine of judicial estoppel.  The first issue is dispositive.  The City's argument that, under the PCCSA and the Podium Lease, it is entitled to an inflation adjustment before it must divide rent in excess of $2,733,000 has no merit.  So there is no need to address whether, *had* the City's argument been meritorious, the City would have been judicially estopped from raising it.

## Discussion

¶14.    Zeroing in on the contract-interpretation issue, the City faults the chancellor for not construing the PCCSA and the Podium Lease together.  The City insists the simultaneous execution of the two agreements by the same parties to resolve the ongoing dispute concerning the Point Cadet property requires reading them together.  *Sullivan v. Mounger*, 882 So. 2d 129, 135 (Miss. 2004) (citing the general contract-law principle that separate agreements executed at the same time, by the same parties, for the same purposes, and as part of the same transaction, are to be construed together).  And the City argues that, when read together, the two documents are consistent that the City is to receive a CPI increase to its $2,733,000 base rent.

---

reconsider," invoking both Rule 59 and Rule 60(b) of the Mississippi Rules of Civil Procedure.  This motion was solely aimed at the chancellor's ruling regarding judicial estoppel as applied to the City, which the City asked the chancellor to reconsider and withdraw.  The chancellor denied the City's motion to reconsider through a second order that more specifically detailed why judicial estoppel applied.

¶15. But the chancellor *did* just what the City asks. She did read the two documents together, finding neither contract to be ambiguous. And while the Podium Lease clearly included a CPI adjustment every five years on the casino's floor rent, the Podium Lease *did not* govern how the City, the State, and the IHL must divide the casino's rent.

¶16. Our de novo review leads to the exact same conclusion. *See **Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.***, 857 So. 2d 748, 751 (Miss. 2003) (holding that "questions concerning the construction and interpretation of contracts are questions of law" reviewed de novo). Even when the Podium Lease is factored in, the Podium Lease simply does not address, let alone *alter,* how the City, the State, and the IHL are to divide the rent collected. Nor could it. The PCCSA expresses that, in the case of any inconsistency between the PCCSA and City leases, such as the Podium Lease, the terms of the PCCSA control. So the primary question for this Court is whether the PCCSA's rent-sharing provision is ambiguous. *Id.* If it is not, this Court must enforce it as written. *Id.*

¶17. After review, the PCCSA is not ambiguous. It entitles the City to "all rents up to an amount equal to" $2,733,000. The City latches on to the phrase "up to an amount equal to." Because it was unknown what the value of $2,733,000 would be in five or six years, the City argues this language was meant "to express the unknown in the equation"—i.e., inflation. The City insists the intent of this phrase was to convey that it was entitled annually to an undivided amount equal to the *2002 value* of $2,733,000. But when interpreting a contract, this Court is less concerned with what the parties might have intended than with what they said. Indeed, "the words employed are by far the best resource for ascertaining the intent and

7

assigning meaning with fairness and accuracy." *Id.* at 752. And here, the City relies on words that undercut its position, especially when *all* the words of the rent-sharing provision are considered.

¶18. The City's argument ignores the second part of the rent-sharing provision. Immediately following the "all rents up to an amount equal to" $2,733,000 clause is the provision that "[a]ll rents *in excess of* two million seven hundred thirty-three thousand and no/100 dollars ($2,733,000.00) will be divided." (Emphasis added.) "When construing a contract, [this Court] will read the contract as a *whole*, so as to give effect to all of its clauses." *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005) (quoting *Royer Homes*, 857 So. 2d at 752). And to give effect to this second clause, "in excess of" $2,733,000, the first clause, "up to an amount equal to" $2,733,000, must be interpreted to mean what it says—an amount up to $2,733,000 and not a penny more.

¶19. This straightforward interpretation of the PCCSA's rent-sharing provision is consistent with the Podium Lease and the requirement that the $2,733,000 floor for annual rent be adjusted every five years for inflation. Still, the City argues the CPI adjustment in the Podium Lease to the $2,733,000 floor would have no meaning unless it aims to alter the guaranteed rent collected by the City *before* sharing the excess with the State and IHL. But as the chancellor pointed out, this CPI adjustment means increasingly there will be more "excess" to be shared among the City, the State, and the IHL after the City collects its base rent. That may cut against the City's current interest. But it is worth noting that the PCCSA was entered after a long-standing dispute over ownership of the Point Cadet property. So it

8

is not unreasonable for the City to have compromised by entering an agreement initially entitling it to all the guaranteed floor the casino would pay in rent, which over time would require it to increasingly share with the State and the IHL any guaranteed rent that exceeded $2,733,000.

¶20. The bottom line is the PCSSA is clear—the City is entitled to the first $2,733,000 in annual rent collected, no more and no less. And any additional rent collected will be divided in thirds. Therefore, the City's is not entitled to a CPI increase to the $2,733,000 figure.

¶21. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**